


BENJAMIN E. LEACE
DIRECT DIAL: 610-993-4208
EMAIL: beleace@ratnerprestia.com

March 19, 2007

The Honorable Mary L. Cooper
Clarkson S. Fisher Federal Building & U.S. Courthouse
402 East State Street, Room 5000
Trenton, NJ 08608

Re: MedPointe Healthcare, Inc. v. Morton Grove Pharmaceuticals, Inc.
Civil Action No. 3:04-CV-01686

Dear Judge Cooper:

This firm represents Morton Grove Pharmaceuticals, Inc. ("Morton Grove") in the above-entitled matter.

During the hearing on March 1, 2007 regarding MedPointe's motion for summary judgment of no inequitable conduct, the Court asked counsel to submit letter briefs regarding the deposition testimony of one of Morton Grove's expert witnesses, Cameron K. Weiffenbach, Esquire along with copies of Mr. Weiffenbach's expert report and a transcript of his deposition testimony. More specifically, the Court asked the parties to explain how Mr. Weiffenbach testified regarding the materiality of putting the '597 Patent before the Examiner reviewing the '206 Application. Since the Court did not ask us to brief intent, we have mentioned it only briefly in the context of discussing materiality. Mr. Weiffenbach covered the evidence that points to intent in his expert report.

We provided the Court with a copy of Mr. Weiffenbach's expert report, with exhibits, on March 5, 2007[1], and Mr. Curtin provided the Court a copy of the deposition transcript on March 5, 2007.

## I. MR. WEIFFENBACH'S EXPERT REPORT CLEARLY ESTABLISHES THAT THE WITHHELD REFERENCES ARE MATERIAL

Mr. Weiffenbach's expert report is 47 pages long and contains 10 exhibits. Two pages following page 47 of his report identify the documents he reviewed prior to preparing his report. At his deposition, he indicated that the source he used to learn the definition of coryza, an ailment recited in the '597 Patent, was inadvertently omitted from the list. (90:7-92:2). He also inadvertently omitted the '597 Patent from the list. (79:4-80:2).

---

1 A copy of pages between page 47 and Tab "A" of Mr. Weiffenbach's expert report may have been inadvertently omitted from the copy delivered to the Court. Accordingly, a copy of these pages are attached to this brief as Exhibit A.





Mr. Weiffenbach's report states that he was "asked to opine on the rules of practice and procedure in the U.S. Patent and Trademark Office ("U.S. PTO") and on the issue of inequitable conduct and materiality of prior art references with respect to the prosecution of U.S. Patent No. 6,417,206." (Report at p. 1). He is "an expert in areas related to patent practice before the U.S. Patent and Trademark Office including . . . violation of U.S. Patent and Trademark Office Rule 37 C.F.R. § 1.56." (Report at p. 2).

"The duty of candor and good faith is codified in Rule 56. Rule 56 imposes a duty to disclose to the Patent Examiner all information known to the patent applicant and his or her legal representatives to be material to patentability." (Report at pp. 23-24). The report discussed two different versions of Rule 56. (Report at p. 24).

Pages 37-47 of his report discuss the importance of the '597 litigation (and the underlying references/information disclosed during the '597 litigation), specifically addressing its materiality, and the evidence of Mr. Olstein's intent. According to Mr. Weiffenbach,

> What was missing from the prior art of record at the time the '206 Examiner allowed the patent, was the motivation for a person of ordinary skill in the art to substitute pyrilamine tannate for chlorpheniramine tannate to arrive at the composition set forth in claim 1 of the '206 Patent. In my opinion, the Primary Examiner would have found the expert report by Dr. Triolo, his direct and cross-examination testimony during the preliminary injunction hearing, the evidence submitted with his expert report, the bench ruling by the Court and subsequent order (Exhibit J) (collectively, "the '597 litigation information") important in deciding whether to issue the patent because the information would have provided a motivation for substituting pyrilamine for chlorpheniramine. (Report at p. 37).
>
> The '597 and '206 Patents are commonly owned and claim therapeutic compositions. The issue at the hearing for preliminary injunction with respect to the '597 Patent was whether there was motivation to replace chlorpheniramine with pyrilamine in the claimed composition. The same question was at issue during the prosecution of the '206 Patent. In this regard, the two patents are related. Therefore, the '597 litigation information related to the issue of substitution would have been regarded by the U.S. PTO as being relevant and important to the prosecution of the '206 Patent. (Report at p. 37).
>
> The '597 litigation preliminary injunction hearing testimony would have provided the Examiner with direct and cross-examination of the experts skilled in the art with respect to the issue of whether there would have been motivation to substitute pyrilamine tannate for chlorpheniramine tannate . . . . Also, the trial testimony would have provided the Examiner with the view point of the judge at the hearing who had viewed the demeanor of the witnesses and his view point as to obviousness based on the evidence and testimony. For all of the foregoing reasons, the





> '597 litigation information that was not disclosed to the U.S. PTO would not have been cumulative of the prior art of record. (Report at p. 38).
>
> I am of the opinion that the information contained in Dr. Triolo's expert report, as well as his expert testimony and exhibits attached to the report, would have been material to the examination of the '206 Application because the information, when combined with the prior art of record and the admissions of prior art in the patent disclosure, would have established a *prima facie* case of obviousness. (Report at p. 39).
>
> I am of the opinion that the '597 litigation information would also have been material to the examination of the '206 Application, because the information was inconsistent with arguments asserting patentability contained in the March 13, 2002 mailed response to the November 2001 Office Action that Mr. Olstein approved for filing. Also, the arguments were inconsistent with arguments made opposing an argument of unpatentability relied upon by the Examiner. . . . In view of the fact that the '597 Patent was cited as being material prior art in the statement and an issue in the hearing was whether a person having ordinary skill in the art would have been motivated to substitute pyrilamine for chlorpheniramine, Mr. Olstein should have at least provided Mr. Stauffer with the '597 litigation information to review. (Report at pp. 40-41).
>
> [Dr. Triolo] further opined and testified that there would have been motivation to substitute pyrilamine tannate for chlorpheniramine tannate because pyrilamine is less anti-cholinergic than chlorpheniramine. [citation omitted]. This fact was not disputed by MedPointe during the preliminary injunction hearing. (Report at p. 43).
>
> Dr. Triolo's testimony and his reliance in his expert report on the *Basic Pharmacology of Medicine* article provide the motivation to support the Examiner's rejection. (Report at p. 44).
>
> The '597 litigation information withheld from the U.S. PTO would have provided the Examiner with motivational evidence for finding a *prima facie* case of obviousness and was inconsistent with the argument made asserting patentability, as well as inconsistent with arguments made opposing an argument of unpatentability relied upon by the Examiner, making it highly material. (Report at p. 47).

Accordingly, it is clear that Mr. Weiffenbach opined in his expert report as to the materiality of the references and information from the '597 litigation that Mr. Olstein withheld from the Patent Examiner while prosecuting the '206 Patent application.





## II. MR. WEIFFENBACH'S DEPOSITION TESTIMONY CONFIRMED THE OPINION HE PRESENTED IN HIS EXPERT REPORT AND DEMONSTRATES THAT HE PROVIDED MEDPOINTE WITH A FULL AND FAIR OPPORTUNITY TO QUESTION HIM ABOUT HIS OPINIONS AND THEIR BASES

Mr. Weiffenbach responded to questions and testified at length at his deposition regarding the materiality of the references and other '597 litigation information that Mr. Olstein withheld. For example:

Mr. Weiffenbach testified that he has expertise in Patent and Trademark Office practice and procedure, violations of Patent Office Rule 56, and inequitable conduct. (10:17-21). Rule 56 was in effect during the prosecution of the '206 Application. (166:14-15). When considering the issue of materiality, the reasonable examiner standard applied during the pendency of the '206 Application. (166:18-167:9). In fact, the patent practitioner had to be aware of two standards, including the reasonable examiner standard for materiality. A prudent practitioner would have evaluated materiality under both standards. (171:17-172:3). The same result would be obtained under both standards. (170:3-171:5).

He clearly stated that applications are related to each other if they have "similar subject matter." (105:23-106:4). The applications need not have the same inventors (106:5-6) and need not be continuations or continuations-in-part. They could have a common owner and different inventive entities. (106:15-17). A litigation matter could be considered related to the subject of a pending application and trigger a disclosure obligation without the same or a similar invention being claimed, without there being the same inventors, and without the patent and the application belonging to the same patent family. (106:24-107:10).

The general issue before the Examiner "was the substitution of chlorpheniramine with pyrilamine." (143:23-144:3). The Examiner was "looking at[] whether it would be within the skill of the art to make the substitution." (117:22-24). Dr. Triolo testified as a person skilled in the art regarding the substitutability of one for the other. (159:9-23). Dr. Triolo's testimony in the '597 litigation "was that it would have been within the skill of the art to either use pyrilamine or chlorpheniramine and that the two are interchangeable." (116:11-14). "[T]he question before the examiner in the '206 prosecution was the motivation to make that substitution. Even though it was done in the two-component composition, there's no reason that I see it can't be a substitution made in the three-component." (162:9-14). *See also*, 189:15-20.

Mr. Weiffenbach testified that he is making a materiality determination based upon information provided by Dr. Triolo. (120:3-121:4). "I am the one that's saying that this information would have been material to an examiner in making a decision as to patentability of a composition claim." (121:9-12). Mr. Olstein should have disclosed





Dr. Triolo's expert reports from the '597 litigation and the judge's order because "I understood Dr. Triolo to basically infer that pyrilamine could be substituted for chlorpheniramine and that it would have been obvious to one skilled in the art to do so." (151:25-152:17; 156:24-157:4).

Referring to page 37 of his report, Mr. Weiffenbach testified that "[w]hat was missing from the prior art of record at the time the '206 examiner allowed the patent was the motivation for a person of ordinary skill in the art to substitute pyrilamine tannate for chlorpheniramine tannate at [sic] the composition set forth in claim 1 of the '206 Patent." (164:16-21). The Examiner, in combination with Dr. Triolo's opinion, may not have allowed the claims in view of Dr. Triolo's opinion regarding what would have been known to a person of ordinary skill in the art. (164:4-8).

When asked which was more material, Dr. Triolo's opinion or the '597 Patent itself, Mr. Weiffenbach testified that "Triolo's opinion was evidence that could have persuaded her [the Examiner] that there's sufficient grounds and evidence for her to reach a conclusion that a person skilled in the art would have been motivated to make the substitution." (186:21-187:4).

> Q: So, then, it's your testimony and your opinion that the testimony of Dr. Triolo in the '597 litigation as to motivation to make a substitution was more material than the patent itself which showed that the substitution had been made?
>
> * * * * * * *
>
> A: I'm going to respond by saying that I don't see in the '597 Patent where there is a teaching in here of chlorpheniramine. There's only a teaching of pyrilamine.
>
> And I do not see in this teaching here that the examiner could reach a conclusion that it would be within the skill of the art to substitute chlorpheniramine -- or excuse me -- pyrilamine for chlorpheniramine. (188:7-24).

Mr. Weiffenbach also testified:

> In this particular case, I am of the opinion -- I don't -- can't believe that Mr. Olstein did not believe this, this particular testimony or expert report was not material. (199:21-24).
>
> * * * * * * *

REDACTED





Mr. Weiffenbach's deposition testimony clearly shows that he fully responded to questions regarding the materiality of the references and information withheld by Mr. Olstein.

## III. SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE MR. WEIFFENBACH'S EXPERT REPORT AND HIS DEPOSITION TESTIMONY IDENTIFIED A NUMBER OF FACTUAL DISPUTES THAT CAN BE RESOLVED ONLY AT A TRIAL ON THE MERITS

There are more than enough disputed issues of materials facts to warrant denial of MedPointe's summary judgment motion . Mr. Weiffenbach's expert report and deposition testimony alone are sufficient to warrant denial, even without considering the other factual issues presented by Morton Grove in its papers and in its arguments at the March 1, 2007 hearing.

In *Cargill, Inc. v. Canbra Foods, Ltd.*, a case just handed down by the Court of Appeals for the Federal Circuit last month, the Court confirmed that "[M]ateriality is determined from the viewpoint of a reasonable patent examiner, and not the subjective beliefs of the patentee." *Cargill, Inc. v. Canbra Foods, Ltd.*, 2007 U.S. App. LEXIS 3222 at *14 (Fed. Cir. February 14, 2007). As summarized in Sections I and II above, Mr. Weiffenbach through his expert report and deposition testimony opined that the withheld information was material to the Examiner's consideration of the patentability of the '206 Application.

In fact, "[a]n applicant should know information is material when the Examiner repeatedly raises an issue to which the information relates." *Cargill* at *15. "Close cases should be resolved by disclosure, not unilaterally by the applicant. That rule is drawn from the policy that applicants should continue to submit information for consideration by the Office in applications rather than making and relying on their own determinations of materiality." *Id.* at *19 (citations and internal quotations omitted).

> While we have recognized that subjective good faith can support a defense to inequitable conduct, there is no such thing as a good faith intent to deceive. When an applicant knows or ***obviously should know*** that information would be material to the examiner, as was true here, but the applicant decides to withhold that information, "good faith" does not negate an intent to manipulate the evidence. Indeed, self-serving manipulation of highly material evidence can hardly be called "good faith." ***[G]ood faith did not negate inequitable conduct because the withheld information was known by counsel and counsel should have known that it was material to the examiner.***

*Id.* at *19-*20 (some citations and internal quotations omitted, emphasis added). The present case is not even close.





The issue of substitutability was specifically raised by one of the Examiners and recognized by MedPointe during the prosecution of the '206 Application. In a rejection on November 19, 2001, an Examiner of the '206 Application concluded that

> *one skilled in the art would have been motivated to prepare a therapeutic composition comprising specific antihistamines or decongestants that exhibit a more favorable adverse effect profile.* The skilled artisan in formulation chemistry through no more than routine experimentation would have been motivated to prepare a composition having a decongestant, anti-tussive agent and antihistamine in the form of a suspension for use in the treatment of cough associated with adverse respiratory tract conditions in view of the reference. *Nothing unobvious is noted in the interchange of various agents within established categories of drugs.*

(Exhibit C to Weiffenbach Report, MG 000804 (emphasis added); *See* Weiffenbach Report at pp. 27-28).

The above Office Action in the '206 Application showed that the Examiner was raising the issue of whether it would have been obvious to prepare a therapeutic composition by substituting "various agents within established categories of drugs." This inquiry by the Examiner demonstrated that evidence to combine was material to the Examiner's consideration.

Mr. Olstein was clearly well aware of the '597 litigation and the references/information that he learned of from the '597 litigation. The litigation had concluded just one month before he and his brand new associate, Mr. Stauffer, filed both a response to the November 19, 2001 Office Action and Rule 1.56 Statement (a.k.a. Information Disclosure Statement, "IDS"). That Mr. Olstein knew of the information and should have known of its materiality can not be denied, because Mr. Olstein assigned, reviewed, and approved these papers just one month after an unsuccessful three day preliminary injunction hearing and three months of litigation prior to the hearing. Aside from these telling facts regarding the substantive information that Mr. Olstein knew at the time he approved the filing of the response and the IDS, there are cases that have held information from a prior litigation that was not *familially* related to the patent application being prosecuted may be material to an Examiner's consideration of patentability.

In *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.*, the District Court for the Northern District of Indiana, held that the charge of infringing one patent would have been important to a reasonable examiner in deciding whether to allow another patent. *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.* 837 F.Supp. 1444, 1477 (N.D. Ind. 1992), *aff'd*, 11 F.3d 1072, 1993 U.S. App. LEXIS 28844 (Fed. Cir. 1993), *cert. denied*, 511 U.S. 1128 (1994).





In the *Golden Valley* case, Golden Valley's '513 Application pertained to flexible packaging sheets for cooking popcorn in a microwave package. 837 F.Supp. at 1453-1454. It was prepared, filed, and prosecuted by Attorney Harmon. 837 F.Supp. at 1447, 1455. While the '513 Application was pending, Golden Valley filed a Declaratory Judgment action against James River Corp. because James River had previously charged that Golden Valley's popcorn bag infringed James Rivers' '010 Patent. 837 F.Supp. at 1464. Mr. Harmon was an attorney of record in the James River litigation. *Id.* An amendment in the Golden Valley '513 Application did not discuss the James River '010 Patent or the fact that Golden Valley's popcorn bag had been charged with infringing the James River '010 Patent. *Id.* at 1465.

Finding that Mr. Harmon did not apprise the Examiner about the existence of the litigation or about information he learned through the litigation, the Court held that "the knowledge that the Golden Valley popcorn bag, which was the subject of the '513 Application, had been charged with infringing the Bohr [James River] '010 Patent would have been important to a reasonable examiner in deciding whether to allow the '513 Application to issue as a patent." Because the litigation involved the James River '010 Patent, and other James River patents, "[a] reference to the James River litigation would have revealed James River's contributions to the technology, the existence of [other pertinent devices], and other commercially available products withheld by Mr. Harmon." *Id.* at 1465.

"The relevance and materiality of the James River litigation is beyond question. James River's assertions against Golden Valley were material, though not necessarily acknowledged by Golden Valley, and these material assertions should have been brought to the attention of" the Examiner. 837 F.Supp. at 1466. The Court specifically held that:

> there is a duty to disclose the existence of material information that may be brought out in related litigation that is pertinent to patentability. If evidence comes to light that is contrary or in conflict with assertions being made in the application, those would be deemed material to a reasonable examiner. It is the "material information" and not the mere existence of a lawsuit that needs to be brought to the attention of the examiner with regard to related litigation. If material information, such as supporting test data, ***prior art***, etc., comes to an applicant's attention as a result of assertions in the lawsuit, then there is an obligation to disclose that to the examiner.

837 F.Supp. at 1477 (footnotes omitted) (emphasis added).

The *Golden Valley* case therefore was a case where information from a separate and prior litigation should have been disclosed about a patent (the James River '010 Patent) that was not a continuation of the patent that was pending before the U.S. PTO (the Golden Valley '513 Application).





Mr. Weiffenbach's report opines that "the '597 litigation information would also have been material to the examination of the '206 Application, because the information was inconsistent with arguments asserting patentability contained in the March 13, 2002 mailed response to the November 2001 Office Action that Mr. Olstein approved for filing." (Weiffenbach Expert Report at p. 40) Mr. Weiffenbach testified that the '597 litigation was related by subject matter and thus was required to and should have been disclosed. (*See* 105:23-107:10; 121:9-12; 151:2-152:17; 156:24-157:4; 164:4-8; 200:9-13). *Golden Valley* was cited with approval in *Environ Prods., Inc. v. Total Containment, Inc.*, 1997 U.S. Dist. LEXIS 8935 at *10 (EDPA 1997).

The cited *Environ Products* case was the second action between the parties. In this second action Environ contended that Total Containment, Inc. ("TCI") infringed the Environ '318 Patent. *Id.* at *2. In the first action, TCI had been the plaintiff alleging that Environ infringed TCI's '408 and '509 Patents. *Id.* at *2. During the course of the first action, Environ and its attorneys made several statements which TCI contended in the second action should have been disclosed to the U.S. PTO in connection with the '537 Application that resulted in the Environ '318 Patent. *Id.* at *3-*4. More specifically, TCI contended that Environ should have disclosed a declaration by Webb (identified as "Webb IV") which admitted that a certain invention (Environ II) was not patentable over the prior art. *Id.* at *11. Despite Environ's previously submitted Webb IV declaration in the earlier litigation, Environ asserted that Environ II was patentable during the prosecution of the '318 Patent. *Id.* at *11. Because Webb IV (and other information) was not disclosed during the prosecution of the '318 Application, TCI contended that the '318 Patent was unenforceable. *Id.* at *5.

The Court held that "[b]ecause Mr. Webb's declaration contradicts the assertion of patentability made during the prosecution of the '537 Application, Webb IV is material information under PTO Rule 56(b)." *Environ Products* at *11-*12. In addition, Environ filed a reply brief in the earlier litigation that contained an assertion that was similar to the assertions in Webb IV. *Environ Products* at *4. The Court held that Environ's reply memo was also material information under PTO Rule 56 because it was "inconsistent with a position Environ took in asserting an argument of patentability." *Id.* at *14.

Accordingly, even though the information withheld from the U.S. PTO from the prior litigation were statements made by *Environ* and its attorneys, the Court in *Environ Products* still held that information from prior litigation involving a TCI patent should have been disclosed to the U.S. PTO during the prosecution of an unrelated Environ patent. Thus, Golden Valley and Environ confirm Mr. Weiffenbach's position that related subject matter from a prior litigation is not limited to only a familial relationship between the patents.





At the March 1, 2007 hearing, MedPointe repeated the contention in MedPointe's briefs that *Arthrocare Corp. v. Smith & Nephew, Inc.*, 310 F.Supp. 2d638 (D. DE 2004), *rev'd in part on other grounds*, 406 F.3d 1365 (Fed. Cir. 2005), held that information in preliminary injunction litigation regarding one patent is not material to an Examiner for purposes of examining a different patent application. We disagree with MedPointe's position regarding this case.

In the Delaware action, Arthrocare alleged that Smith & Nephew infringed the '536, '882, and '592 Patents. 310 F.Supp. 2d at 643. In previous litigation in California, Arthrocare had sought a preliminary injunction to prevent a different company, Ethicon, Inc., from infringing the '909, '536, '281, and '882 Patents. In the California action, the California court, Orrick, J., denied the preliminary injunction motion finding substantial questions about whether the patents were valid. *Id. at* 651. In the cited Delaware litigation, Smith & Nephew contended that Arthrocare committed inequitable conduct because Arthrocare failed to disclose Judge Orrick's opinion to the Examiner during the prosecution of the '592 Patent. *Id.* at 672-73.

The Delaware court concluded that Judge Orrick's opinion was not material to the patentability of the '592 Patent in part because the opinion did not directly address the anticipatory effect of specific prior art on the application that was granted as the '592 Patent. Instead, Judge Orrick found that the specific prior art raised substantial questions as to the validity of patents other than the '592 Patent, namely, the '536 and '281 Patents. 310 F.Supp. 2d at 675-76. The Delaware court, however, then concluded:

> Even assuming, *arguendo*, that Judge Orrick's opinion was material, Arthrocare complied with its duty of disclosure . . . .
>
> * * * * * * * *
>
> **Arthrocare submitted a list of documents from the *Arthrocare v. Ethicon, Inc.* litigation to the PTO**. This list **included Judge Orrick's opinion**. The court cannot conclude that Arthrocare intended to deceive the PTO concerning Judge Orrick's opinion given its compliance with **Section 2001.06(c)**.

*Id.* at 676 (emphasis added). Consequently, the Delaware court granted Arthrocare's motion for entry of judgment of no inequitable conduct as to the '592 patent. *Id.*

Far from supporting a position that MedPointe was excused from disclosing material references and information from the '597 litigation, *Arthocare* is a clear example of what Mr. Olstein should have done during the prosecution of the '206 Patent. He should have disclosed the '597 litigation and its underlying references - just as the applicant did in *Arthrocare*.





Further, the Court in *Arthrocare* did not state that defendant Smith & Nephew had presented any expert testimony in support of its inequitable conduct claim. In contrast, in the present case Morton Grove's expert, Mr. Weiffenbach has opined that:

- the '597 litigation and the underlying references/information from the '597 litigation were material to the examination of the '206 Application and should have been disclosed to the Examiner of the '206 Application; and

- the subject matter of the '597 litigation was related to the examination of the '206 Application.

**IV. <u>AT HIS DEPOSITION, MR. WEIFFENBACH FULLY EXPLAINED THE BASES FOR HIS EXPERT OPINION</u>**

At the March 1, 2007 hearing, MedPointe incorrectly asserted that at his deposition, Mr. Weiffenbach:

> was unable to recall any of the bases for his report and explained that he had been instructed by counsel for Morton Grove to stop work on the matter in September of 2002. So we were unable to cross-examine him about his report. (Tr. 16).

Morton Grove strongly denies that Mr. Weiffenbach was unable to recall any of the bases for his report or that MedPointe was unable to cross-examine him about his report. The deposition transcript and the summary above in Sections I and II, make this more than clear. The reality is that MedPointe was unable to attack Mr. Weiffenbach's opinion and is merely grasping at straws.

Mr. Weiffenbach's deposition began at 10:10 a.m. on May 25, 2006 and ended at 5:22 p.m. the same day with a 16-minute break (30:13-19), a luncheon recess (77:24-78:4), a 13-minute break (127:11-15), and a 37-minute break (154:23-155:3) for total testimony time of 5 hours and 25 minutes out of a 7 hour and 12 minute day. The deposition transcript ran for 203 pages. This is far from being "unable to cross-examine him about his report." Some of the details of his deposition regarding materiality were summarized and discussed above. At the conclusion of the deposition, Jonathan A. Marshall, Esquire, MedPointe's counsel, announced that he had no further questions. He did not object to Mr. Weiffenbach's testimony, nor did he state that he needed additional time for Mr. Weiffenbach. (203:6-7). If MedPointe needed additional information from Mr. Weiffenbach for any reason, it could have objected.

MedPointe did not object. *See* 23:19-24; 25:3-7; 27:16-28:8; 28:14-29:4; 66:12-67:11; 67:17-68:11; 68:25-69:11; 80:3-6; 92:3-93:5. In fact, at the end of Mr. Weiffenbach's deposition, when Morton Grove's counsel suggested he might have some follow-up questions, Mr. Marshall suggested that he did not have time:





THE VIDEOTAPE SPECIALIST: We are back on the record. The time the 5:22 p.m.

MR. MARSHALL: Mr. Weiffenbach, I have no further questions.

THE WITNESS: Thank you, sir.

MR. DONNELLY: Just take a moment.

MR. MARSHALL: Do you have more than five minutes? Because --

MR. DONNELLY: I have, I have no questions either.

MR. MARSHALL: Okay.

(203:4-14).

Tellingly, MedPointe was not specific in its papers or at the hearing, but only vaguely referred to various parts of Mr. Weiffenbach's transcript in Exhibit 2 to the Supplemental Declaration of George C. Jones referenced on page 13 n. 31 of MedPointe's opening summary judgment brief.

Mr. Weiffenbach's lack of recall regarding a few peripheral matters during a full day deposition did not affect his ability to testify at his deposition, in detail, about his expert opinions and the bases for them, as described above. For the most part, vaguely referenced exchanges were no more than an attempt to portray Mr. Weiffenbach as unprepared because MedPointe was unable to attack the substance of Mr. Weiffenbach's opinions. If MedPointe's brief expresses any alleged prejudice, Morton Grove would like an opportunity to respond.

MedPointe did not even make a real attempt to obtain information about any issues that it may now allege prevented MedPointe from cross-examination. If MedPointe was truly interested in obtaining information, it could have used Mr. Weiffenbach's expert report to refresh his recollection, or could have asked him to read the other documents, and then question him based upon his refreshed recollection. For example, Mr. Weiffenbach repeatedly said he would have to re-read Judge Lifland's memorandum and order in order to testify about it. Although MedPointe's counsel clearly understood that Mr. Weiffenbach needed to refresh his recollection by re-reading the opinion, MedPointe's counsel did not ask Mr. Weiffenbach to do so. (70:12-77:14). It was not Morton Grove's counsel's job to suggest to MedPointe's counsel to refresh Mr. Weiffenbach's memory at a deposition noticed by MedPointe.

On the other hand, Mr. Weiffenbach did recall reading over two thousand pages of documents upon which he did rely without requiring his memory to be refreshed,





including: the entire transcript of the '597 litigation, the deposition of Raymond Stauffer with the exhibits, the deposition of Elliott Olstein and the exhibits, the transcript of Ronald Leflein and the exhibits, the deposition of Alexander D'Addio and the exhibits, the deposition of Beth Hecht and the exhibits, and the file history of the '206 Patent. (64:21-66:11). Mr. Weiffenbach's expert report confirms that he reviewed certain documents at the time he prepared his expert. The fact that he did not recall reviewing a few documents or conversations that took place a year before his deposition is at best a topic for cross-examination at trial; not a reason to grant summary judgment of no inequitable conduct.

## V. <u>CONCLUSION</u>

For all of the above reasons, as well as those cited in its prior briefing papers and presented at the hearing on this issue, Morton Grove has identified a series of factual issues regarding the materiality of the '597 litigation and regarding Mr. Olstein's intent that were ignored in MedPointe's moving papers. There is more than enough factual basis to support a finding that inequitable conduct occurred by the withholding of material references and information by MedPointe's patent attorney. Accordingly, MedPointe's motion for summary judgment should be denied.

Respectfully,

RatnerPrestia

Benjamin E. Leace

SW/BEL:lcf

Attachment: Exhibit A

cc: As per transmittal letter of Sheila Raftery Wiggins, Esq. of Duane Morris

124075

# Exhibit A

Exhibit A -- Curriculum Vitae of Cameron Weiffenbach

Exhibit B -- Selected Patent Statutes, Sections of 37 C.F.R., and Excerpts from the MPEP
35 U.S.C. §§ 102, 103
37 CFR 1.56 (1991)
37 CFR 1.56 (2002)
MPEP §§ 724, 2001.06

Exhibit C -- '206 Patent File History [MG000758-MG00847]

Exhibit D -- Transcripts of 3-day Preliminary Injunction Hearing pertaining to U.S. Patent No. 6,287,597 on February 11-13, 2002 in Civil Action No. 01-5190 (JCL), in the U.S. District Court for the District of New Jersey before the Honorable Judge John C. Lifland (including testimony of experts, closing arguments, and ruling from the bench) [MG003331, 3394-3826]

Exhibit E -- Expert Report of Dr. Anthony J. Triolo, Ph.D, in connection with the 2002 Litigation of U.S. Patent No. 6,287,597 including all of Dr. Triolo's Exhibits except for the file history of the '597 patent [MG002572-2592; 2550-2725]

Exhibit F -- Expert Report of Dr. Stanley L. Hem's Expert Report in connection with the 2002 Litigation of U.S. Patent No. 6,287,597 (without Exhibits duplicative of those in Exhibit E) [MG002796-2828]

Exhibit G -- Deposition Transcript of Raymond E. Stauffer

Exhibit H -- Deposition Transcript of Elliott Olstein

Exhibit I -- U.S. Patent No. 2,842,585

Exhibit J -- Order from Judge Lifland dated February 14, 2002

**DOCUMENTS REVIEWED**

MedPointe's Complaint filed April 13, 2004

Morton Grove's Amended Answer/Counterclaim filed August 14, 2004

Preliminary Hearing Transcripts (February 11-13, 2002)

Deposition transcript of Raymond Stauffer and exhibits

Deposition transcript of Elliot Olstein and exhibits

Deposition transcript of Ronald Leflein and exhibits

Deposition transcript of Alexander D'Addio and exhibits

Deposition transcript of Beth Hecht and exhibits

File History of U.S. Patent No. 6,417,206

File History of U.S. Patent No. 6,464,094

File History of U.S. Patent No. 6,566,396

File History of U.S. Application No. 09/209,618

U.S. Patent No. 2,842,585

Judge Lifland's ruling from the bench

Judge Lifland's Order dated February 12, 2002

Judge Lifland's Memorandum and Order dated March 27, 2003

Judge Hughes' Memorandum Opinion of August 4, 2005

Morton Grove's Notice of Motion to Allow Supplemental Brief with attachments Expert

Report of Dr. Anthony Triolo from '597 litigation

Expert Report of Dr. Stanley Hem from '597 litigation

Donald S. Chisum, *Patent Law Digest*, 2004 Edition, LexisNexis Matthew Bender, 2004 Chapters 4100-4300

*Manual of Patent Examining Procedure*, 8th Edition, May 2004 Revision, Maheu Publishing (2004), Section 402.02, 403, 724 and 2001.06, 2001,06(c) and 2004

U.S. Patent and Trademark Office web site (uspto.gov) – assignment search and Manual of Patent Examining Procedure

*Boehringer v. Schering-Plough Corp.*, 68 F.Supp.2d 508 (D. N.J. 1999)

*Dayco Products Inc. v. Total Containment, Inc.*, 329 F.3d. 1358 (Fed. Cir. 2003)